Reva BILLINGS and William
Morrison, Appellants,

v.

DIVISION OF EMPLOYMENT
SECURITY, Respondent.

No. SC 92682.

Supreme Court of Missouri,
En Banc.

April 9, 2013.

Rehearing Denied May 28, 2013.

Canice T. Rice Jr., St. Louis, for Billings and Morrison.

Michael E.C. Pritchett and Shelly A. Kintzel, general counsel for the department of labor and industrial relations in Jefferson City, for the division.

LAURA DENVIR STITH, Judge.

Reva Billings and William Morrison appeal the Labor and Industrial Relations Commission's denial of unemployment compensation of Trade Readjustment Allowance or Trade Adjustment Assistance pursuant to the federal Trade Act of 1974. This Court reverses. The commission erred in considering them to have ceased work on July 3, 2008, the date they received their contractually required advance notice of the future dates on which they would be furloughed. The correct dates are the dates their furloughs admittedly

became effective, not withstanding that their employer chose not to require them to be physically present at the workplace during the notice period. For this reason, the facts of the case do not support the Labor and Industrial Relations Commission's denial of Trade Act benefits. The decision is reversed, and the case is remanded.

## I. STATEMENT OF FACTS

Western Union Financial Services ("Western Union") operated a call center in Bridgeton, employing approximately 800 workers prior to the spring of 2008. Reva Billings worked as an international operator at the Bridgeton facility, and William Morrison worked there as a customer service operator. On July 3, 2008, Western Union advised Ms. Billings that she would be laid off on July 20 and Mr. Morrison that he would be laid off on August 7. A letter provided to Mr. Morrison that day stated:

> Your last day worked is today, and you will be paid a notice period between 7/5/2008 and 08/06/08. You will be placed on Furlough Force Reduction (FFR) *effective* 8/7/2008.

Ms. Billings received a nearly identical letter, the only difference being that her notice period ended and she was told her furlough would be effective on July 20, 2008, rather than August 7, 2008. After they signed the letter, Western Union collected Ms. Billings and Mr. Morrison's employee badges and released them to return home. The two did not return to work at the call center. Both, however, continued to collect full pay until the end of their respective notice periods.

The collective bargaining agreement between Western Union and the Communication Workers of America (CWA) union provided that if Western Union wanted to lay-off union employees, it must provide those with at least one year of service 15 days notice prior to their "force-reduction furlough." Ms. Billings and Mr. Morrison each had over one year of service. Consistent with the union contract, Western Union's July 3 letter provided Ms. Billing and Mr. Morrison with at least 15 days notice before placing them on furlough force reduction (i.e., laying them off).

Under the Trade Act of 1974, workers who have lost their jobs as a result of foreign trade may be eligible for weekly allowances and training. In order to activate the eligibility for benefits, a group of workers can petition the United States Department of Labor for certification of eligibility. 19 U.S.C. § 2271(a). If the Department certifies the group, it will set an eligibility "impact date." The impact date is the date upon which the department determines that total or partial layoffs began or threatened to begin at the business to which the certification applies. 20 C.F.R. § 617.3(v) (2012). The Department cannot set this impact date more than one year earlier than the date that the petition for eligibility for Trade Acts benefits was filed.

On July 16, 2009, CWA filed a petition with the United States Department of Labor seeking to certify Western Union's former employees at the Bridgeton facility as eligible for benefits under the Trade Act of 1974. The Department of Labor determined that the former Bridgeton call center employees were eligible for Trade Act benefits. Because the CWA filed their petition on July 16, 2009, the Department set the impact date as July 15, 2008, (one year prior to the petition date).

Once the Department of Labor finds that a particular group of employees is eligible for Trade Act benefits and sets the impact date, state employment security agent officials determine the eligibility of individual claimants within that group. A

condition for a claimant to be eligible for Trade Act benefits is that the claimant's date of separation from employment must have occurred on or after the determined impact date. For Ms. Billings and Mr. Morrison to be eligible for Trade Act benefits, their dates of separation must have occurred on or after the July 15, 2008, impact date.

Following certification of the Bridgeton workers by the Department of Labor, Ms. Billings and Mr. Morrison applied for their benefits to the Missouri Division of Employment Security ("Division"). The Division denied benefits to both on the grounds that they were separated from employment prior to the July 15, 2008, impact date. It found the date of separation for Ms. Billings and Mr. Morrison to be July 3, 2008, the day that they were sent home and given their contractually-required notice that they would be laid off in the near future.

Ms. Billings and Mr. Morrison appealed the Division's denial of Trade Act benefits, arguing that their date of separation did not occur until they actually were laid off at the end of the notice period; therefore, after the July 15, 2008, impact date. The Appeals Tribunal ruled that Ms. Billing's and Mr. Morrison's date of separation was July 3, 2008, upholding the denial of Trade Act benefits. The two then appealed to the Labor and Industrial Relations Commission, which affirmed and adopted the Division's rulings, finding them "fully supported by the competent and substantial evidence on the whole record and ... in accordance with the relevant portions of the Missouri Employment Security Law." Following appeal to the Missouri Court of Appeals, this Court granted transfer. Mo. Const. art. V, sec. 10.

## II. STANDARD OF REVIEW

When considering an appeal from a decision of the commission, "[t]he findings of the commission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law." Section 288.210, RSMo 2000. This Court may modify, reverse, remand for rehearing or set aside a decision of the Commission on the following grounds and no other: "(1) that the commission acted without or in excess of its powers; (2) that the commission's decision was procured by fraud; (3) that the facts found by the commission do not support the award; or (4) that there was no sufficient competent evidence in the record to warrant the making of the award." *Id.* Although this Court defers to the commission's findings of fact, where "there is no factual dispute, and the issue is the construction and application of a statute, the case presents an issue of law that this Court reviews *de novo.*" *Difatta–Wheaton v. Dolphin Capital Corp.,* 271 S.W.3d 594, 595 (Mo. banc 2008).

The Trade Act is a federal law and all benefit and program administration costs are borne by the federal government, but the Act delegates individual eligibility decisions to the states. Nonetheless, when reviewing eligibility decisions, state agencies and courts shall construe the Act "liberally so as to carry out the purpose of the Act" and "so as to assure insofar as possible the uniform interpretation and application of the Act ... throughout the United States." 20 C.F.R. § 617.52.

## III. ANALYSIS

Whether Ms. Billings and Mr. Morrison are eligible for Trade Act benefits hinges upon a single question: did each's "date of separation" from Western Union occur on July 3, 2008, or did it occur at the end of each's notice period? If it occurred on July 3, 2008, then Ms. Billings and Mr. Morrison are not eligible for Trade Act

benefits because each's date of separation would have preceded the impact date. But, if their dates of separation occurred at the end of each of their notice periods (July 20 and August 7, 2008, respectively), then their separation from employment fell after the impact date, and the two are eligible for Trade Act benefits.

Under the Trade Act, the date of separation is defined as:

(i) For an individual in employment status, the last day worked ..."

20 C.F.R. § 617.3(*l*)(1). There is no dispute that Ms. Billings and Mr. Morrison were in "employment status" at the time they received notice on July 3, 2008, that Western Union was to eliminate their positions. What the parties disagree upon is when Ms. Billings and Mr. Morrison worked their "last day."

The Act does not provide a definition of "work" or "last day worked," and no state or federal court has addressed its meaning under the Act. Western Union in this Court construes "last day worked" to mean the last day that an employee *actively* provided services to the employer. Under this interpretation, the company contends that Ms. Billings and Mr. Morrison worked their last day on July 3 because they were told to go home and were not recalled to the call center after this date.[1] This Court disagrees.

Although no provision of the Trade Act defines "work," it *does* define "employment." It is identified as "any service performed for an employer by an officer of a corporation or an individual for wages." 20 C.F.R. § 617.3(*o*). A plain understanding of their meanings demonstrates that "work" and "employed" are synonymous.

*See, e.g., Roget's II, The New Thesaurus 484 (3rd ed.1995)* ("hired" is explained as: "Having a job: employed, jobholding, retained, working.")

Here, while the letters sent to Ms. Billings and Mr. Morrison informed them that the employer did not want them to be present in their workplace after the date of their letters, it also told them that they would not be furloughed until certain future dates and they would be and were paid until the time of their furloughs. While in its brief Western Union refers to their pay as "terminal pay," nothing in the record supports that reference. They received their regular pay, not severance pay, or vacation pay, or any other kind of pay given in lieu of wages. In fact, a Western Union human resources member sent a letter to Ms. Billings during her Division appeal, stating that she was "laid off from Western Union ... on 07/20/2008." A similar letter was sent to Mr. Morrison, stating that he was "laid off from Western Union ... on 08/07/08." At least one former call center worker also testified before the Division that Western Union representatives and Division employees said that they could not receive unemployment benefits until after they were no longer being paid by the company.

Why, then, was the notice sent on July 3, 2008, if these employees were still going to be employed until a later date? The reason for the notice period prior to termination and furlough was that the employees' union contract required that they receive 15 days written notice prior to the effective date of any furlough. Article 24.04 of the agreement between the CWA union and Western Union provided:

[1]. Western Union's notice letter referred to July 3, 2008, as their "last day worked," but in a later letter said that they were employed until the day their furloughs were effective— July 20 and August 7, respectively. Although the latter arguably is an admission against interest as to what Western Union intended to be their last day, for purposes of the statute what constitutes "last day worked" is a legal issue for the courts to resolve rather than a factual one that the employer can fix in time by the use of magic words.

When a reduction of force is necessary, the Company agrees to give fifteen days written notice of force-reduction furlough to affected employees with class-of-work seniority of one year or more."

A "furlough" is by definition a lay off and a "lay off" is by definition the end to an employment relation. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 923, 1281 (1993). Western Union cites no authority for this Court to consider the period after the notice and before the employment ended as some sort of novel but undefined status that neither constitutes work nor unemployment. To the contrary, the union contract requires notice *prior to* force reduction. If Ms. Billings and Mr. Morrison were terminated from work prior to 15 days after they received the notice on July 3, and thereafter had received some different type of "terminal pay" rather than wages, Western Union would be in violation of its contract obligation to give notice 15 days *before* a reduction in force is to become effective. It denies such a violation.

Western Union's contrary interpretation is based on the erroneous supposition that the employer must allow the worker to be physically present at the workplace or actively engaged in work away from the workplace for the employee still to be working for the employer. A few simple hypotheticals illustrate the flaw in this logic.

Suppose that a worker were given permission to work from home or from a remote but non-work location? Would that employee be able to qualify for a day worked? This is a more and more common scenario. Must such workers show that they were ready, willing and able to work even though not on the work premises on a particular day on which they were not given work,[2] whereas a worker present on premises need not do so?

Alternatively, suppose that an employer informed employees that they were to be laid off on the last day of the month, when their furlough would begin. But, the last two days of the month happened to fall on a Saturday and Sunday, and the employees worked Monday through Friday. The employees were paid through the end of the month as promised in their notice. What would be their last day "worked" for purposes of the Trade Act? If Western Union's interpretation of "last day worked" were correct, because the employees did not come into the workplace on the weekend, "work" would cease at the end of the day Friday, even though the employer specifically stated that the date of separation was not to occur for another two days, and even though they were paid for those days and, thus, not fired or available to obtain other work. It would be like arguing that employees do not work for their company on weekends and recommence work each Monday. This is not the case. If the employer declares that the employee is to be paid until a particular day of the month, and that pay is not severance pay or furlough pay but actual work pay, as is the case here, then the employees are considered working until the time of their separation from employment.[3]

For all of these reasons, this Court holds that the Commission erred in finding that the period of separation began on July 3, 2008. The July 3, 2008, notice gave 15 days notice before the workers' furloughs be-

**2.** This is what the two employees say occurred here—they were at home awaiting word whether they would be called back to work during the period after the notice but before their employment ended and their furloughs began. Western Union denies they were on call although they were not fired, they continued to receive their full salaries and were not receiving severance pay nor were they on vacation.

**3.** This conclusion is supported by the fact that the CWA contract provided that force-reduc-

came effective. They were paid wages for the following period, not any special type of notice or furlough or vacation pay—to the contrary, the union contract forbid the notice from being given during a worker's vacation period and required notice *prior to* furlough, not paid time *after* furlough. Western Union also failed to provide the workers with any notice that they were no longer subject to being called into work. That Western Union chose not to have them come into their workplace once they were told that they would be laid off in the near future may have made good business and security sense, but it did not change the fact that they still were employed during the 15–day notice period between being notified that they would later be furloughed and the dates on which the later furloughs actually became effective.

## IV. CONCLUSION

Ms. Billings and Mr. Morrison continued to work for Western Union until the day that they were actually furloughed on July 20 and August 7, 2008, respectively. Because their separation from employment occurred after the July 15, 2008, impact date of certification under the Trade Act, the facts of the case do not support the Labor and Industrial Relations Commission's denial of Trade Act benefits. The decision is reversed, and the case is remanded.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, FISCHER and WILSON, JJ., concur.

DRAPER, J., not participating.

tion furlough notices could not run concurrently with any vacation period. If an employee's physical absence from the premises on a particular day were held to preclude a finding that the employee worked that day, then the vacation caveat in the contract would not be necessary.